## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| NANCY E. BRYNE,<br><br>          Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,<br><br>          Defendant. | CV 17-149-BLG-TJC<br><br>**ORDER** |

On November 3, 2017, Plaintiff Nancy E. Byrne ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, 1382c(a)(3)(A).  (Doc. 1.)  On January 19, 2018, the Commissioner filed the Administrative Record ("A.R.").  (Doc. 4.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of Defendant's denial and an award of disability benefits and supplemental security income payments.  (Doc. 9.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 10, 11.)

For the reasons set forth herein, and after careful consideration of the record and applicable law, the Court finds the ALJ's decision should be **AFFIRMED**.

## I.     PROCEDURAL BACKGROUND

Plaintiff filed applications for disability benefits and supplemental security income on April 2, 2012 and March 8, 2012, respectively.  (A.R. 477-485.)  Plaintiff alleged she has been unable to work since December 1, 2010 due to her disabling conditions.  (A.R. 477, 484.)  The Social Security Administration denied Plaintiff's applications initially on December 3, 2012, and upon reconsideration on March 1, 2013.  (A.R. 241-249.)

On April 3, 2013, Plaintiff requested a hearing on the Social Security Administration's determination.  (A.R. 251.)  Administrative Law Judge Lloyd Hartford (the "ALJ") held a hearing on September 25, 2013.  (A.R. 79-142.)  On November 13, 2013, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 208-233.)

Plaintiff requested review of the decision by the Appeals Council.  (A.R. 299.)  On April 9, 2015, the Council vacated the decision and remanded the case for a new hearing and decision.  (A.R. 235-238.)  The ALJ held a second hearing on March 25, 2016.  (A.R. 45-78.)  On June 1, 2016, the ALJ again found Plaintiff not disabled.  (A.R. 16-44.)

Plaintiff requested review of the decision, and on September 7, 2017, the

Appeals Council denied Plaintiff's request for review. (A.R. 1-7.) Thereafter,

Plaintiff filed the instant action.

## II.  LEGAL STANDARDS

### A.  Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial

review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g),

1383(c)(3). The scope of judicial review is limited. The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is

based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See

also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may

reverse the ALJ's decision to deny benefits only if it is based upon legal error or is

not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human

Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a

preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d

1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to

support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a

whole, the Court must weigh both the evidence that supports and detracts from the

ALJ's conclusions.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

**B.    Determination of Disability**

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C.

§§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing the record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III. FACTUAL BACKGROUND

### A. The Hearings

Plaintiff's initial hearing was held before the ALJ in Billings, Montana on September 25, 2013. (A.R. 79-142.) Plaintiff testified that she was unable to work because of stroke, depression and anxiety, obstructive sleep apnea, ankle injuries, seizure disorder, vertigo, COPD, constant fatigue, and degenerative disc disease. (A.R. 99.) Plaintiff explained that she previously worked as a heavy equipment operator and truck driver, but she stopped working in those occupations when she began experiencing vertigo. (A.R. 102-103.) She also indicated that she briefly worked as a cashier before her alleged onset date of disability. (A.R. 103.)

Regarding her physical limitations, Plaintiff testified that she has severe back pain. She explained that she has a cervical spine impairment resulting from

"arthritis, degenerative disc, and bulging disc." (A.R. 107.) She said the pain has occurred for several years and is "really bad" most of the time. (A.R. 108.) She also said her neck pain causes numbness in her arms and hands. (A.R. 108-109.) She testified that her neck pain has gradually increased. (A.R. 109.) She also testified that she has severe pain in her lumbar spine, which prevents her from bending or standing for a long period of time. (A.R. 110.) She takes naproxen for the pain, which she stated decreases her back pain from a 10 to a 7 on a pain scale of 1 to 10. (A.R. 112-113.)

Plaintiff also testified that she experiences dizziness that may either be vertigo or seizures. (A.R. 101-106.) She explained that when the dizziness occurs, she can't get out of her chair because she feels like she will fall to the floor. (A.R. 106.) The episodes last a few seconds to a few minutes, and it takes her some time to recover from each episode. (A.R. 122.) She testified that her most recent episode was three weeks prior to the hearing. (A.R. 122.) She takes medication to treat this condition. (A.R. 106-107.)

Plaintiff also discussed her history of stroke, explaining that she had a stroke sometime between September of 2011 and March of 2012. (A.R. 113.) She credits her uncertainty as to the exact date of the event to her doctor's theory that the stroke occurred while she was asleep. (A.R. 113.) Plaintiff thinks she may

have balance issues because of the stroke, but no other problems have presented. (A.R. 114.)

Plaintiff also testified that she has ankle and foot problems. (A.R. 115.) She explained that she fractured her ankle multiple times, tore the ligament, and tore her Achilles tendon. (A.R. 115.) Plaintiff testified that she has not had surgery for any of these issues. (A.R. 115.) Nevertheless, Plaintiff stated that she wears a support brace on her ankle and elevates her leg all day long. (A.R. 124-125.) She explained that the brace becomes uncomfortable when her leg swells from standing or walking a lot. (A.R. 125.)

Finally, Plaintiff testified she has obstructive sleep apnea. (A.R. 128.) She stated that she wears a CPAP mask every night, but she is still fatigued during the day. (A.R. 128.) She said she was unsure why she was experiencing fatigue during the day but indicated her sleep apnea doctor would be testing her for narcolepsy. (A.R. 128.) Plaintiff stated that she sleeps 6-7 hours at night and also sleeps during the day. (A.R. 129.)

As to her activities, Plaintiff stated that she drinks coffee, washes dishes with breaks, watches television, does some cleaning, and sleeps. (A.R. 116.) She said she does not go shopping alone, but instead goes with her boyfriend on the weekends. (A.R. 116.) She explained that she returned her commercial driver

license when she developed vertigo and a seizure condition.  (A.R. 119.)    But she retained her personal driver's license and will occasionally drive.  (A.R. 117, 119.)

Regarding her physical abilities, Plaintiff stated that she can lift a gallon of milk but cannot carry it far.  (A.R. 119.)  She also stated she can only stand on her feet for 10 minutes, and can only walk one block, before her back pain requires her to sit or stop walking.  (A.R. 129-130.)  She further testified that she can only sit for 5-20 minutes before she starts fidgeting and needs to get up.  (A.R. 130.)

Following the Appeals Council's remand, a second hearing was held in Billings, Montana on March 25, 2016.  (A.R. 45.)  The ALJ intended to question a neurologist regarding Plaintiff's claimed narcolepsy.  (A.R. 49.)  But the neurologist testified she was not qualified to give an opinion as to narcolepsy because that diagnosis was outside her specialty.  (A.R. 52.)  The neurologist briefly testified as to Plaintiff's seizure history, indicating her seizure frequency was "pretty good."  (A.R. 55.)  As to the Plaintiff's stroke and vertigo diagnoses, the neurologist stated her neurologic examinations were "normal."  (A.R. 56.) Finally, the neurologist indicated that Plaintiff's cervical spondylosis would give her limitations on lifting and prolonged sitting and standing.  (A.R. 58.)  The hearing concluded with Plaintiff's representative stipulating that Plaintiff could not establish a diagnosis of narcolepsy.  (A.R. 76.)

///

### B.   Medical Evidence

##### 1. *James Carpenter, M.D.*

Dr. Carpenter is an internal medicine physician who served as Plaintiff's primary physician from 2011-2012. (A.R. 672.)  Dr. Carpenter recorded a history of neck pain, back pain, numbness, joint pain, ankle pain, migraines, vertigo, sleep apnea, and depression.  (A.R. 674, 911.)  Dr. Carpenter ordered an MRI of Plaintiff's spine and head to evaluate her complaints.  (A.R. 672, 673.)  The MRI of Plaintiff's spine found mild reversal of the cervical lordotic curve, mild spondylosis, mild degenerative joint disease, and a small disc protrusion.  (A.R. 672.)  The MRI of plaintiff's head and neck found normal neck soft tissues, a small retention cyst, and a chronic cortical infarct in the left cerebellum.  (A.R. 673.)  Due to the infarct finding, Dr. Carpenter referred Plaintiff to neurology.  (A.R. 679.)  Dr. Carpenter prescribed a CPAP face mask, anti-depressants, and anti-inflammatory medications for her pain, and referred her to various specialists for her other symptoms.  (A.R. 698, 898, 902.)

On September 20, 2011, Plaintiff was examined for her sleep apnea.  (A.R. 776.)  The findings indicated Plaintiff's sinuses, TMJ, and cervical spine were within normal limits.  (A.R. 779.)  The specialist recommended Plaintiff use a mouth appliance to help with her sleep apnea.  (A.R. 779.)

On September 27, 2011, Plaintiff underwent an electronystagmogram ("ENG") for her vertigo symptoms. (A.R. 775.) The test results indicated no issues and returned a normal finding. (A.R. 775.) The specialist concluded that Plaintiff's dizziness was most likely migraine-related vertigo. (A.R. 788.)

To assess her orthopedic complaints, Plaintiff had an x-ray of her lumbosacral spine on December 15, 2011, which found no significant abnormality. (A.R. 946.) An MRI of Plaintiff's ankle confirmed a 50 percent partial thickness hairline tear in her Achilles tendon, subtle contusions, moderate edema of the soft tissue, and moderate degenerative narrowing. (A.R. 964-966.) On February 29, 2012, Plaintiff was fitted with an orthotic for her ankle and sent to physical therapy for her Achilles tendon tear. (A.R. 921.)

On April 19, 2012, Dr. Carpenter completed a multiple impairment questionnaire. (A.R. 703-710.) Dr. Carpenter indicated that Plaintiff's primary symptoms are back and knee pain. (A.R. 704.) He also reported that Plaintiff's symptoms increased with standing for more than fifteen minutes, sitting for extending periods, and bending over. (A.R. 705.) He indicated it would be necessary or medically recommended for Plaintiff not to sit continuously in a work setting. (A.R. 705.) He further indicated Plaintiff is capable of low stress work but has significant limitations in reaching, handling, fingering, or lifting, and her condition prevents her from keeping her neck in a constant position. (A.R. 707-

708.)  Dr. Carpenter opined that while Plaintiff is likely to have good days and bad days, she is likely to be absent from work more than three times a month due to her symptoms.  (A.R. 709.)

### 2. *Toby Yaltho, MD*

Dr. Carpenter referred plaintiff to Dr. Yaltho, a neurologist, in August of 2011 for her complaints of dizziness.  (A.R. 730.)  Dr. Yaltho concluded that Plaintiff's dizzy episodes were consistent with vertigo.  (A.R. 731.)  He also stated that Plaintiff's MRI of the brain and MRA of the neck were normal, and her neurologic examination was also normal.  (A.R. 731.)  Dr. Yaltho recommended that Plaintiff have an EEG and ENG to ensure she was not experiencing seizure activity.  (A.R. 732.)

On September 23, 2011, Dr. Yaltho noted Plaintiff's EEG results were abnormal.  (A.R. 729.)  The results showed evidence of left front temporal dysfunction due to subtle left temporal slowing.  (A.R. 729.)  On November 28, 2011, Dr. Yaltho noted Plaintiff's ENG results were normal, and her migraines with aura were resolved.  (A.R. 723-724.)  He referred Plaintiff to an ear, nose, and throat specialist to further evaluate her vertigo.  (A.R. 723.)

On February 14, 2012, Dr. Yaltho saw Plaintiff for complaints of numbness in her hands.  (A.R. 722.)  He ordered testing which found very mild left median

neuropathy at the wrist, which he diagnosed as carpal tunnel syndrome. (A.R. 720.) The test results of her right hand were normal. (A.R. 720.)

On March 30, 2012, Plaintiff reported she woke up with bruises on her arm and had periods of intermittent confusion. (A.R. 716.) Dr. Yaltho ordered an EEG, which again was abnormal, indicating an epileptogenic focus in the left temporal region. (A.R. 715.) Dr. Yaltho prescribed Keppra to help with her episodes, and also suggested she discuss her condition with her employer. (A.R. 713.)

Dr. Yaltho completed a chronic vertigo disease impairment questionnaire on April 25, 2012. (A.R. 1098-1102.) He diagnosed Plaintiff as having vertigo, obstructive sleep apnea, migraines, and seizures. (A.R. 1098.) He identified vertigo and visual disturbances as symptoms supporting his diagnosis. (A.R. 1099.) He explained that Plaintiff's vertigo episodes occur about twice per month and last one minute each. (A.R. 1099.) Dr. Yaltho opined that Plaintiff's symptoms would significantly interfere with her concentration and are likely to last twelve months. (A.R. 1101.) He also indicated that Plaintiff would likely have good days and bad days and could tolerate low stress work, but she would likely miss work once a month due to her vertigo. (A.R. 1101.) Lastly, he noted that Plaintiff's condition prevented her from working in an environment with fumes, gases, temperature extremes, humidity, dust, and heights. (A.R. 1102.)

### 3. *Lynda Heaphy, NP*

N.P. Heaphy treated Plaintiff for sleep apnea from February 21, 2012 through May 2, 2012. (AR. 1104.) She ordered a chest x-ray on February 21, 2012 which showed hazy lower lung fields. (A.R. 1125.) N.P. Heaphy counseled Plaintiff on refraining from smoking and losing weight. (A.R. 1125.) She prescribed nasal spray for Plaintiff. (A.R. 1125.)

Plaintiff returned to N.P. Heaphy for a follow-up visit on April 20, 2012. (A.R. 1117.) N.P. Heaphy discussed the results of Plaintiff's polysomnography test, which reported mild obstructive sleep apnea. (A.R. 1117.) Plaintiff was given an auto-CPAP following the test, and she reported to N.P. Heaphy that it was comfortable, and she had slept well with it so far. (A.R. 1117.)

Plaintiff's last visit with N.P. Heaphy was on May 2, 2012. (A.R. 1113.) N.P. Heaphy noted that Plaintiff was doing well on auto-CPAP, though her anti-epileptic drug was making her sleepy during the day. (A.R. 1113.) N.P. Heaphy also completed a pulmonary impairment questionnaire that day. (A.R. 1104.) She identified Plaintiff as having COPD with mild episodes of bronchitis. (A.R. 1104-1110.) She also listed Plaintiff's primary symptoms to include shortness of breath with exertion, morning cough, sore throat, fatigue, and back pain. (A.R. 1106.) N.P. Heaphy opined that Plaintiff could sit for 2 hours in an 8-hour workday, and stand or walk for 15 minutes in an 8-hour workday. (A.R. 1107.) She also

indicated that Plaintiff's symptoms and seizure disorder would constantly interfere with her concentration. (A.R. 1109.) N.P. Healy noted, however, that Plaintiff's impairments were unlikely to last for 12 months. (A.R. 1109.) She opined that Plaintiff would need to take a break every 30 minutes, would have good days and bad days, and would likely miss work more than three times per month. (A.R. 1109.) Lastly, she noted that Plaintiff would need to avoid odors, fumes, temperature extremes, humidity, dust, perfumes, gases, solvents, and cigarette smoke. (A.R. 1109-1110.)

      4. *Diane Yahn, MD*

Dr. Yahn saw Plaintiff between November 27, 2013 through February 3, 2016. (A.R. 1291.) On March 6, 2014, Dr. Yahn saw Plaintiff "to review/assess her disability status." (A.R. 1300.) Dr. Yahn identified Plaintiff's complaints, and noted that she had been evaluated for vertigo, back pain, neck pain, and knee pain. (A.R. 1300.) Dr. Yahn reported that the Plaintiff can sit for more than 15 minutes without increased pain, and the pain subsides when Plaintiff gets up and moves. (A.R. 1300.) She also stated that Plaintiff's vertigo episodes are unpredictable. (A.R. 1300.) Due to Plaintiff's medical problems, Dr. Yahn felt Plaintiff was unable to work. (A.R. 1300.)

Dr. Yahn also completed a multiple impairment questionnaire in March of 2014. (A.R. 1291-1299.) She opined that Plaintiff could sit 2-3 hours and stand 0-

1 hours in an 8-hour day. (A.R. 1293.) She also indicated Plaintiff should not sit, stand, or walk continuously in a work setting and must get up every 15 minutes. (A.R. 1294.) Dr. Yahn further noted that Plaintiff has significant limitations in doing repetitive reaching, handling, fingering, or lifting due to her neck pain. (A.R. 1294.) She also opined that Plaintiff's symptoms would frequently affect her concentration, but that Plaintiff can tolerate low stress work. (A.R. 1296.) Dr. Yahn explained that Plaintiff would likely have good days and bad days, and her impairments may require her to miss work more than three times per month. (A.R. 1297.)

On September 30, 2015, Plaintiff saw Dr. Yahn to discuss her joint pain. (A.R. 1553.) Plaintiff complained of hip, wrist, and hand pain, and requested x-rays for these issues. (A.R. 1553.) Dr. Yahn ordered x-rays of Plaintiff's hands and right wrist to determine the cause of her pain. (A.R. 1553.) The x-rays found no fracture, malalignment, or significant arthropathy, and minimal osteoarthritis at the second DIP joint on the right side. (A.R. 1545-1546, 1558.)

On February 14, 2016, Plaintiff saw Dr. Yahn for a follow-up and to complete disability paperwork. (A.R. 1564.) Dr. Yahn noted Plaintiff had a history of medical problems including "significant degenerative disc and joint disease." (A.R. 1564.) She also noted that Plaintiffs' joint disease has significant interaction with Plaintiff's seizure disorder and history of stroke. (A.R. 1564.)

16

Finally, Dr. Yahn stated that she filled out Plaintiff's disability paperwork, and opined that her medical problems significantly impair her ability to work. (A.R. 1564.)

### 5. *Jeffery Knight, MD*

Plaintiff saw Dr. Knight from July 2012 through September 2013. (A.R. 1201, 1279.) At Dr. Knight's initial consultation with Plaintiff, he noted her pain had been under decent control, she no longer experienced vertigo, her sleep was improved with the use of a CPAP, she continued to smoke, and she had a suspected history of osteoarthritis resulting in daily knee pain. (A.R. 1202.) He performed a physical examination, noting Plaintiff did not appear "acutely unwell," had a non-antalgic gait, a clear chest, obese abdomen, regular heart, and no edema. (A.R. 1202.)

Plaintiff had a follow up visit with Dr. Knight on August 24, 2012. (A.R. 1205.) She complained of restlessness in her legs, which prevented her from falling asleep at night. (A.R. 1205.) Dr. Knight suspected Plaintiff had restless leg syndrome and prescribed medication to help with this issue. (A.R. 1205.) During the visit, Dr. Knight also noted Plaintiff recently had an echocardiogram, which yielded normal results. (A.R. 1205.) Finally, Dr. Knight discussed Plaintiff's respiratory symptoms, and advised Plaintiff that quitting smoking is the most important step she can take to alleviate these issues. (A.R. 1205.)

On October 26, 2012, Plaintiff visited Dr. Knight again, and reported she had not had any recent seizure activity. (A.R. 1206.) Her last episode was in April of 2012. (A.R. 1206.) Dr. Knight also indicated that Plaintiff's CPAP was working well. (A.R. 1206.) He saw Plaintiff again on March 1, 2013, and reported she was continuing to do well with her CPAP, and her restless leg syndrome medication was effective. (A.R. 1218.)

On September 27, 2013, Plaintiff visited Dr. Knight for a follow up and to discuss her fatigue. (A.R. 1278.) Dr. Knight noted Plaintiff was being evaluated for narcolepsy because of her persistent fatigue, though Plaintiff denied sudden collapses or uncontrolled falling asleep. (A.R. 1278.) Plaintiff reported to Dr. Knight that her lightheadedness and neck pain are quite predictable, and she will not drive if she has these symptoms. (A.R. 1278.)

Dr. Knight also filled out an impairment questionnaire on September 27, 2013. (A.R. 1272-1276.) He listed Plaintiff's diagnoses as epilepsy, neck and back pain, paresthesia, hypersomnolence, sleep apnea, migraines, and history of stroke. (A.R. 1272.) Dr. Knight noted that Plaintiff experiences daily neck and back pain which is aggravated by prolonged sitting and standing on hard surfaces. (A.R. 1273.) He opined that Plaintiff could sit, stand, or walk for 2 hours in an 8-hour workday. (A.R. 1274.) He also indicated that Plaintiff should get up from a seated position hourly, because it is medically necessary for Plaintiff to avoid

sitting continuously in an 8-hour workday. (A.R. 1274.) Dr. Knight also noted that Plaintiff's symptoms would likely increase if she were placed in a competitive work environment, because her sleep and stress disturbances could worsen her seizures. (A.R. 1275.) Finally, he opined that Plaintiff would have to take hourly 15-minute breaks during the workday, and she would be absent from work an average of more than three times per month. (A.R. 1275-1276.)

### 6. *Catherine L. Stephens, MD*

Dr. Stephens treated Plaintiff for COPD and sleep disorders on two occasions in June and July 2015. (A.R. 1517-1526.) On July 22, 2015, Dr. Stephens completed a pulmonary impairment questionnaire. (A.R. 1519-1524.) She noted that Plaintiff was diagnosed with obstructive sleep apnea but indicated that she found no impairment and opined that Plaintiff was a malingerer. (A.R. 1519.) Dr. Stephens also opined that Plaintiff could sit, stand, or walk for 6 or more hours in an 8-hour day. (A.R. 1521.) She also commented that she disagreed with prior diagnoses of COPD, because pulmonary function tests indicated no airflow obstruction. (A.R. 1524.) Dr. Stephens further commented that she does not think Plaintiff has narcolepsy because her sleep latency tests were unsupportive of that diagnosis. (A.R. 1524.)

On December 29, 2015, Dr. Stephens reiterated her treatment history of Plaintiff. (A.R. 1525.) She stated that Plaintiff's sleep apnea was effectively

treated. (A.R. 1525.) She also stated that Plaintiff had multiple sleep latency tests, which returned negative findings for narcolepsy. (A.R. 1525.) Dr. Stephens continued to treat Plaintiff with a CPAP. (A.R. 1525.) As to Plaintiff's COPD, Dr. Stephens stated that pulmonary function tests were performed and showed no evidence of airflow obstruction. (A.R. 1526.) She noted the tests showed mild restrictive lung disease due to her obesity. (A.R. 1526.)

### C. The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 1, 2010. (A.R. 24.) Second, the ALJ found that Plaintiff has the following severe impairments: "vertigo, seizures, bilateral plantar fasciitis, back pain (degenerative disease of the lumbar spine); degenerative disease of the cervical spine; degenerative joint disease of the bilateral knees; chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea ("OSA"), and obesity." *Id.* Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments. (A.R. 25-26.) Fourth, the ALJ stated Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.976(b) except the claimant can stand 4 hours during an 8-hour workday; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; and frequently balance, stoop, kneel, crouch, and crawl. In

addition, the claimant must avoid even moderate exposure to hazards (machinery, heights, etc.); and must avoid concentrated exposure to extreme cold and vibration.

(A.R. 27.)

The ALJ next found that Plaintiff can perform her past relevant work as an office assistant. (A.R. 31.) The ALJ found that Plaintiff's work as an office assistant does not require the performance of work-related activities precluded by her RFC. *Id.* The ALJ further found that Plaintiff had acquired skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. (A.R. 32.) Thus, the ALJ found that Plaintiff was not disabled. (A.R. 33.)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) the ALJ improperly weighed the medical opinion evidence and thus failed to properly determine her functional capacity; and (2) the ALJ improperly discredited her testimony. (Doc. 9 at 2.)

### A. Consideration of the Treating Physician's Opinions

Plaintiff contends that the ALJ erred by failing to consider the opinions of Dr. Knight and N.P. Heaphy, and by discounting the opinions of Dr. Carpenter, Dr. Yaltho, and Dr. Yahn. (Doc. 9 at 21-22). Plaintiff also argues the ALJ erred by primarily relying on the opinion of Dr. Stephens. (Doc. 9 at 23.)

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.) The Commissioner applies a hierarchy of deference to these three types of opinions. The opinion of a treating doctor is generally entitled to the greatest weight. *Id*. ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id*. *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it

is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

If the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p). In that event, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to accord the opinion. *See* Social Security Ruling 96-2p (stating that a finding that a treating physician's opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."). The factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(I)-(ii), (c)(3)-(6); *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017).

Opinions of treating physicians may only be rejected under certain circumstances. *Lester,* 81 F.3d at 830. To discount an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons." *Id.* To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Reddick*, 157 F.3d at 725. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831. However, "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

1. *Did the ALJ fail to consider the opinions of Dr. Knight and N.P. Heaphy?*

Plaintiff first argues that the ALJ erred by failing to consider the opinions of Dr. Knight and N.P. Heaphy in his 2016 decision. (Doc. 9 at 21-22.) Plaintiff is

correct that the ALJ did not discuss the opinions of Dr. Knight or N.P. Heaphy in the instant decision. But he did not ignore their opinions – he incorporated his prior discussion of their opinions into the decision. (A.R. 221-222.)

Acting in accordance with the Appeals Council's directives, the ALJ narrowed his discussion in the 2016 decision to new evidence submitted with Plaintiff's request for review. (A.R. 20.) Nevertheless, he also expressly adopted "the evidence and findings addressed in the former determination . . . as if set forth herein and are not further addressed in this Decision, except for convenience or to change a former finding." *Id.* The ALJ's adoption of his prior findings regarding the practitioners' opinions was proper. *See Ford v. Colvin,* 2015 WL 4608136 (D. Del. July 31, 2015) (collecting cases and finding an ALJ may properly incorporate a decision previously vacated by Appeals Council).

In the ALJ's 2013 decision, the ALJ afforded Dr. Knight's opinion little weight, because his opinions were not consistent with objective medical evidence, and were not supported by his own office notes. (A.R. 221.) The ALJ also cited specific clinical evidence to support his determination. *Id.* An ALJ may reject a treating physician's opinion on the basis that a conflict exists between the treating physician's opinion and the physician's notes. *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).

With respect to N.P. Heaphy, the ALJ afforded her opinion no weight in his 2013 decision. (A.R. 221.) The ALJ said N.P. Heaphy was not an acceptable medical source, but he nevertheless further considered her opinion and found that it was not supported by her own clinical assessment that Plaintiff only had "mild" COPD. (A.R. 221-22.) *See Presley-Carrillo v. Berryhill*, 692 Fed.Appx. 941, 944 (9th Cir. 2017) (finding the ALJ was justified in affording little weight to treating physician's opinion that was incompatible with physician's own treatment notes reflecting consistently mild symptoms.)

Therefore, the ALJ did not fail to consider the opinions of Dr. Knight and N.P. Heaphy. He appropriately incorporated his prior decision which set forth sufficient reasons to discount their opinions.

    2.   *Did the ALJ improperly consider the opinions of Drs. Carpenter, Yaltho, Yahn, and Stephens.*

With respect to the 2016 decision, Plaintiff also argues that the opinions of her other treating physicians, Drs. Carpenter, Yaltho and Yahn, were entitled to controlling weight because the ALJ failed to identify substantial evidence contradicting them.[1] The Court finds the ALJ provided a sufficient basis to discount their opinions.

---

[1] The treating medical opinions were contradicted by non-treating, state agency physician David Jordan, MD. Therefore, the ALJ was required to set forth specific and legitimate reasons supported by substantial evidence to discredit the treating physician's opinions, and not clear and convincing reasons.

In his decision, the ALJ gave the opinions of Dr. Carpenter little weight. (A.R. 29.) The ALJ determined that Dr. Carpenter's opinions were inconsistent with his treatment records and the objective medical evidence. (A.R. 29.) Again, an ALJ may reject a treating physician's opinions on the basis of a conflict between the physician's opinions and his treatment notes. Here, the ALJ adequately explained how Dr. Carpenter's April 19, 2012 opinion conflicted with his treatment notes. For example, the ALJ found that Dr. Carpenter's notes cited objective testing that showed only mild abnormalities and were therefore unsupportive of the limitations articulated in his opinion. (A.R. 29.)

The ALJ also gave little weight to Dr. Yaltho's chronic vertigo impairment questionnaire dated April 25, 2012. (A.R. 29.) The ALJ determined that Dr. Yaltho's opinion was unreliable because Dr. Yaltho only treated Plaintiff a few times during an 8-month period; his opinion was unsupported by an explanation; and his treatment records did not demonstrate objective evidence that Plaintiff's conditions warranted the limitations he identified. (A.R. 29.) First, the ALJ may consider the length of treatment when discounting a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2). "The brevity of the treatment relationship supports the ALJ's decision to discount [the treating physician's] opinion." *Helm v. Comm'r of Soc. Sec. Admin.*, 405 Fed.Appx. 997, 1001 (6th Cir. 2011). In addition, the ALJ found that Dr. Yaltho did not provide any explanation for his

opinion, and his treatment notes and records do not support the limitations set forth in his impairment questionnaire. (A.R. 29.) For example, while Dr. Yaltho's treatment notes indicate that Plaintiff is a commercial truck driver and should discuss her symptoms with her employer, his notes do not discuss the need to avoid or take precaution of any other hazards. (A.R. 713.)

As to Dr. Yahn, the ALJ gave little weight to her March 2014 and February 2016 opinions. (A.R. 30-31.) The ALJ found Dr. Yahn's March 5, 2014 opinion was unexplained and inconsistent with her findings. (A.R. 31.) The ALJ specifically pointed to the mild findings of Plaintiff's lumbar and cervical spine MRI's as an example of inconsistency between the objective findings and Dr. Yahn's opinion. (A.R. 31.) The ALJ also pointed out that Dr. Yahn refers to medical records to support her opinion, but those records primarily document the Plaintiff's complaints and include only minimal exam findings. (A.R. 31.) The ALJ's observations are supported in the record. (A.R. 1281-85, 1300-03.)

The ALJ also found that Dr. Yahn's February 3, 2016 opinion was unexplained and lacked support from objective medical findings. (A.R. 31.) The ALJ found Dr. Yahn's opinion contradictory because it identifies Plaintiff as a malingerer but also opines that some of her functional capabilities have worsened. (A.R. 31.) The ALJ again pointed out that Dr. Yahn does not include an explanation in her opinion, but instead attaches medical records which lack

objective findings supporting her opinion. (A.R. 31.) The attached records include Plaintiff's complaints and some of her treatment history. (A.R. 1552-72.) They also include Plaintiff's hand and wrist x-ray results which show no abnormalities. (A.R.1558, 1561.) The ALJ's findings are therefore supported in the record. (A.R. 1552-72.)

Plaintiff also argues that the ALJ erred by relying primarily on the opinions of Dr. Stephens. (Doc. 9 at 23.) The ALJ gave Dr. Stephens' opinion some weight based on its consistency with Plaintiff's pulmonary and sleep testing results. (A.R. 30.) The ALJ did not accord more weight to the opinion, however, because he found her opinion to be "somewhat confusing." (A.R. 30.) The ALJ pointed out that Dr. Stephens opined that Plaintiff's mild obstructive sleep apnea limited her functions in the workplace, while also stating that Plaintiff's sleep apnea was effectively treated. (A.R. 29-30.) Therefore, the ALJ did not place controlling weight on Dr. Stephens' opinion to determine Plaintiff's disability. He appropriately considered her opinions with respect to Plaintiff's restrictions related to narcolepsy and COPD.

In evaluating the weight to accord to the medical opinions, the ALJ did not specifically reference 20 C.F.R. § 404.1527, or the factors to be considered therein. Nevertheless, a reference to those factors can be found at different parts of the ALJ's discussion. For example, the ALJ did discuss the length and nature of the

Plaintiff's treatment relationship with her physicians. *See e.g.,* A.R. 29 (Dr. Yaltho "treating neurologist every few months beginning in August 2011 . . . He treated the claimant only a few times during a relatively short 8-month period, his opinion is unaccompanied by an explanation); A.R. 30 (Dr. Yahn "treating internist since November 2013"); A.R. 29 ("Dr. Carpenter treated the claimant from mid-October 2011 through February 2012); A.R. 214, 221 ("claimant's treating physician, Jeffery C. Knight, M.D. completed an 'Impairment Questionnaire,'" and "during the several office visits that Dr. Knight encountered the claimant, he did not note debilitating signs or findings." ).

The ALJ also discusses the supportability of the physicians' opinions and their consistency with the record as a whole. *See,* A.R. 221 ("Dr. Knight's assessed limitations are not consistent with the objective medical evidence" (citing examples)); A.R. 29 ("Dr. Carpenter's treatment records fail to support the limitations he set forth" (citing examples); A.R. 29 ("[Dr. Yaltho's] opinion is unaccompanied by an explanation, and his treatment records fail to demonstrate objective evidence that her conditions warrant these limitations (e.g., humidity))"; A.R. 21 ("Dr. Yahn's opinion is not explained, and is inconsistent with, for example, her relatively benign findings on lumbar and cervical spine MRI") ("Dr. Yahn does not explain her opinion, but she attached seven pages of treatment notes which contain no objective medical findings.").

The Court, therefore, finds that the ALJ did not err in weighing the medical opinion evidence. Further, for the same reasons discussed above, the ALJ's RFC is supported by the record. The ALJ's RFC determination was based on consideration of the new objective evidence in the record, and the ALJ's findings in the previous decision. (A.R. 27-31.)

### B. Consideration of the Plaintiff's Testimony

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's testimony, because the ALJ failed to provide specific, clear and convincing reasons for rejecting her testimony. The Commissioner counters that the ALJ properly discounted Plaintiff's symptom testimony.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if he provides "specific, clear and convincing reasons" for doing so. *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner*

*v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

"General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the first step of the credibility analysis is not at issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and did not cite any evidence of malingering. Therefore, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding her symptoms. The Court finds the ALJ did so.

The ALJ found the Plaintiff's testimony regarding the degree of her limitations was not entirely consistent with the medical evidence and other evidence in the record for reasons explained in the decision. (A.R. 31.) Plaintiff

did not testify at the 2016 hearing.  Nevertheless, the ALJ found in his 2016

decision that the new evidence in the record did not establish significant worsening

in the Plaintiff's conditions.  (A.R. 31.)  The ALJ further stated that the evidence

regarding Plaintiff's new condition remains consistent with the RFC's limitations

and the RFC is supported by the prior decision.  (A.R. 31.)

In addition, the ALJ incorporated his findings from the previous decision.

There, the ALJ properly identified specific aspects of Plaintiff's testimony he

found not credible, and also cited specific evidence he believed contradicted that

testimony.  (A.R. 223.)  *Reddick*, 157 F.3d at 722; *Brown-Hunter v. Colvin*, 806

F.3d 487, 489 (9th Cir. 2015).  For example, with respect to Plaintiff's report of

foot and ankle pain and her need to elevate her right leg all day when sitting, the

ALJ pointed out that Dr. Knight opined that it is not necessary for her to elevate

her legs while sitting.  (A.R. 223.)

The ALJ further pointed out that the alleged severity of Plaintiff's COPD

impairment was contradicted by medical test results, and she had not had any

exacerbations requiring emergency care.  (A.R. 223.)  The record supports these

conclusions.[2]

---

[2]   The ALJ also referred to Plaintiff's testimony that she is not taking any
medication for the impairment, and the fact that she continues to smoke.  (A.R.
223.)  But Plaintiff did testify that she uses an inhaler for her COPD.  (A.R. 130.)
Additionally, Plaintiff's inability to quit smoking may be insufficient to discredit
her testimony.  *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) (finding "it

Regarding Plaintiff's vertigo and seizure symptoms, the ALJ noted there was no objective medical evidence indicating Plaintiff had a seizure in several months. (A.R. 223.)  The ALJ also pointed out Plaintiff's testimony that she continues to drive, suggesting the severity of her symptoms are not as significant as alleged. (A.R. 223.)

The ALJ also cites Plaintiff's report to Dr. Knight in July of 2012 that her pain was generally controlled, she was not experiencing vertigo, her sleep had improved, and she did not have shortness of breath.  (A.R. 223.)  These findings are supported by the record.

Although this Court may not evaluate the evidence in the same way as the ALJ, the Court may not substitute its own interpretation of the evidence for the ALJ's interpretation.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Therefore, the Court finds that the ALJ's credibility finding is properly supported by specific, clear and convincing reasons.

## V.    CONCLUSION

Based on the foregoing, **IT IS ORDERED** that the Commissioner's

---

is certainly possible that [claimant] was so addicted to cigarettes that she continued smoking even in the face of [her impairments]").   Nevertheless, the ALJ identifies other valid reasons to discredit Plaintiff's testimony. The Ninth Circuit has recognized that "an ALJ's error [is] harmless where the ALJ provide[s] one or more invalid reasons for disbelieving a claimant's testimony, but also provide[s] valid reasons that [are] supported by the record."  *Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012).

decision denying Plaintiff's claim for disability insurance benefits and

supplemental security income is **AFFIRMED**, and Plaintiff's motion for summary

judgement (Doc. 9) is **DENIED**.

**IT IS ORDERED.**

DATED this 22nd day of March, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge